The **CITY OF PORT ARTHUR,** Texas, Relator,

v.

The Honorable Gary **SANDERSON,** Respondent.

No. 09–91–063 CV.

Court of Appeals of Texas, Beaumont.

June 13, 1991.

Kent M. Adams, Beaumont, for relator.

Glen W. Morgan, Richard Clarkson, Reaud, Morgan & Quinn, Beaumont, for respondent.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

OPINION

BURGESS, Justice.

This is a writ of mandamus action. David and Barbara Miller (Millers) filed suit against the City of Port Arthur, Texas (Port Arthur) and others to seek recovery for the death of their child. The Millers' vehicle was attempting to cross a single lane bridge with wooden slats when the car slid off the roadway and flipped on its side. The child was thrown from the vehicle and the Millers allege the death of their son was caused by the negligence of Port Arthur and others.

In 1987, the Millers sent a discovery request seeking information regarding Port Arthur's experts. Specifically they were asked to identify by occupation all the expert witnesses which it intended to call to testify along with copies of the experts' reports. In November 1987, Port Arthur answered by listing Charles Ruble as an expert in accident and reconstruction (sic) and attached a copy of his report. On

January 31, 1991, Port Arthur filed their Defendant's Supplemental Responses to Discovery listing 57 fact witness and 23 expert witness, including Dr. Olin Dart and Dr. David Frauste. The designation of both consisted solely of their names and addresses; no occupation was listed, nor were any reports attached. The Millers filed a motion to strike the designation of both. The trial court orally granted the motion. Port Arthur filed a motion for the trial court to reconsider. On March 1, 1991, the court heard that motion; denied it and signed the order granting the Millers' motion to strike Port Arthur's experts. That same day, Port Arthur filed its motion for leave to file petition for writ of mandamus. This court, one justice dissenting, granted the motion for leave and stayed the trial court proceedings. TEX.R.APP.P. 121(c), (d). We now deny the petition for mandamus.

■ Port Arthur urges mandamus is appropriate. They seek to compel the trial judge to withdraw the order striking Port Arthur's experts. They argue the experts were designated more than 30 days before trial, TEX.R.CIV.P. 166b(6)(b), and the trial court abused his discretion in striking them. They rely heavily upon *Mother Frances Hosp. v. Coats*, 796 S.W.2d 566 (Tex.App.—Tyler 1990, orig. proceeding), which held that when an order striking witnesses amounts to an emasculation of a party's defense, then appeal is not an adequate remedy and mandamus will lie. *See also Williams v. Crier*, 734 S.W.2d 190 (Tex.App.—Dallas 1987, orig. proceeding). The courts of appeal are divided on this issue. *Forscan Corp. v. Touchy*, 743 S.W.2d 722, 724 (Tex.App.—Houston [14th Dist.] 1987, orig. proceeding) held that the exclusion of two experts was not reviewable by mandamus because the right to offer the evidence by bill of exception is an adequate remedy at law. A very recent case, *Humana Hospital Corp. v. Casseb*, 809 S.W.2d 543 (Tex.App.—San Antonio, 1991, orig. proceeding) held a pre-trial exclusion order was not subject to mandamus. We believe the latter two cases to be the better rule.

■ A writ of mandamus is available to correct a clear abuse of discretion when there is no adequate remedy at law. *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984). The trial court has granted a pre-trial exclusion motion. The witnesses may still be allowed to testify during the trial on the merits. Port Arthur will surely be allowed to make a bill of exception. This is not a discovery dispute involving either the obtaining or retaining of material. This is, in reality, a sanctions ruling that is only available for review in the regular course of an appeal. *Stringer v. Eleventh Court of Appeals*, 720 S.W.2d 801 (Tex.1986); *Central Freight Line, Inc. v. White*, 731 S.W.2d 121, 122 (Tex.App.—Houston [14th Dist.] 1987, orig. proceeding).

The issuance of the writ of mandamus is denied.

WRIT DENIED.

WALKER, C.J., concurs.

BROOKSHIRE, J., dissents.

WALKER, Chief Justice, concurring.

How is it fair to allow one side to a lawsuit to name an expert witness thirty-eight days before trial then disallow the other side that opportunity thirty-one days prior to trial? Good question! I do not have the answer. This is certainly the type proceeding that makes an appellate justice want to stretch his concept of mandamus. I can easily jump the first hurdle, i.e., clear abuse of discretion. It's the second hurdle that brings the fall, i.e., remedy on appeal.

I so agree with Justice Brookshire where in his dissenting opinion he asked "Why not let the jury have the full benefit of all relevant, admissible, non-redundant discovery?" Indeed, why not?

The bottom line reason for this concurrence is to make the point that appellate courts should not try lawsuits. Our business is to seek out and destroy error. Mindful of course, that occasionally our seeking results is our own self-destruction.

Mandamus is not here the remedy.

**478**

BROOKSHIRE, Justice, dissenting.

This dissenting opinion, which I think should be the opinion of the Court, is respectfully, but earnestly, filed. Under the record now before us, I urgently submit that the Court's opinion should read as follows:

"The writ of mandamus will properly lie in this action. David Miller and his wife, Barbara (the Millers), filed litigation against the City of Port Arthur and others, petitioning to recover money damages for the tragic death of their son, Chad Miller. The death resulted from a one-car accident. A parent of Chad's, his father, was the driver. The motorcar departed from the roadway, in some manner falling on its side. The plaintiffs' allegations were that young Chad was thrown from the vehicle and the parents aver that Chad was decapitated by a certain guy wire which was, in turn, attached to a telephone pole of Southwestern Bell. The telephone company sets out contrary allegations. Basically, the telephone company states that its properties or equipments were not involved in the injury to Chad.

"There is another real party at interest, being Jefferson County Drainage District No. 7. The litigation arose from an automobile accident occurring about July 3, 1986. The Millers pleaded a cause of action against the City of Port Arthur, being also a real party in interest. The Millers also sued Southwestern Bell Telephone Company.

"The gravamen of the writ before us is fairly uncomplicated. The record demonstrates that a Dr. John Baerwald, a traffic engineer, was designated as an expert witness for the plaintiffs about 38 days before the case was set for trial on the merits. The litigation on the merits had been previously set for jury selection on a Tuesday, being March 5, 1991. The trial court action permitted Dr. John Baerwald to be an expert witness for the plaintiffs as well as a Dallas physician, Dr. Petty. The issue presented to us is whether Drs. Baerwald, Petty, Dart, and Faust will be allowed to testify. We think Dr. Petty's situation is dramatically different from the others.

"Nevertheless, the trial court disallowed an expert witness, one Dr. Olin Dart, a designated expert witness for the City of Port Arthur, to be an expert witness for the city. Dr. Olin Dart had been designated 31 days prior to the trial date. Dart's designation was in response to Baerwald's. We perceive that the record reflects that Dr. Baerwald had been originally contacted *in April of 1990*, about a year before the trial date. Nevertheless, his designation as an expert witness was revealed or designated only 38 days before the trial date. Of importance also is the fact that the city had requested designations of experts, some three years prior to the date of Dr. Baerwald's designation. Dr. Baerwald was proffered as an expert traffic engineer. In response the city then with dispatch designated Dr. Olin Dart, being a civil engineer of Baton Rouge, Louisiana, as an expert in response to the designation of Dr. Baerwald.

"A reading of TEX.R.CIV.P. 166b(6) entitled "Duty to Supplement" leads us to the conclusion that an expert witness may be *designated or supplemented as soon as is practicable but not less than 30 days prior to the beginning of the trial.* Query: Was Dr. Baerwald designated as soon as practical? Under the entire background of this record we feel that the exclusion of Dr. Dart was an abuse of sound, judicial discretion. Dr. Dart was designated outside of the 30 day limitation period and as reasonably soon as was reasonably practical. Only about 7 or 8 days transpired between the time that one side of the lawsuit designated an expert traffic witness before the city had a chance to make an appropriate expert witness response. It obviously took some reasonable amount of time to do this. It should be remembered that Dr. Olin Dart was a resident of a sister state. We conclude that such designation was as soon as reasonably practical under Rule 166b(6).

"Basically, however, each side is desirous of adding yet another expert, the expert for the plaintiff being Dr. Petty and the expert for the city being Dr. David Faust. Because of the passage of time at this point we think that three of these four

expert witnesses should be allowed to testify before the jury. We conclude that the situation of Dr. Petty is a different, unique problem which will be addressed later in this opinion. At this time, because of the passage of time and the wording of Rule 166b, we conclude that Dr. Baerwald for the Millers should be allowed to testify before the jury and the two latest designated experts of the City, Dart and Faust, be allowed to testify before the jury. Again, this list is not intended to be an exclusive or exhaustive list of expert witnesses. Dr. Petty, depending on future events, may become qualified to testify.

"The Millers and Respondent oppose the writ, stating the City has an adequate remedy at law by appeal. We think it is important to point out that upon a direct appeal that the standards or tests are meaningfully different. The direct appeal is subject to TEX.R.APP.P. 81(b)(1) which governs appealed civil cases. According to that rule the judgment shall not be reversed on appeal and no new trial shall be ordered in any appellate cause on the ground that the trial court has committed an error of law, unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause a rendition of an improper judgment in the case.

"There is yet another basis for reversal. That other basis is that the error was such that it probably prevented the appellant from making a proper presentation of the appellant's whole case to the appellate court and thus being unable to show reversible error. This might include, under certain circumstances, properly interviewing the members of the jury, but such interviewing would be futile since under the trial court's ruling the jury would have never heard certain, important experts from the City. Therefore, it could not be determined what proper *legally recognized effect* the absence of such pertinent, relevant evidence would have had on the jury's verdict.

"The jury's verdict in Texas has a unique quality of finality and inviolability about it. TEX. CONST. art. I § 15.

"Query: Is a direct appeal really an adequate remedy? As a practical matter, under this record, the answer would be "no". An intermediate appellate court is mandated to affirm the jury's verdict if there is any evidence (more than a scintilla) to support the same. Even certain findings are deemed to have been found in favor of and to sustain the judgment of the trial court.

"We should also consider the amount of time, effort, work, expense and other matters put forth by the attorneys, the experts, the lay witnesses, the jurors and other participants in the trial. Likewise, we should be aware of the need for judicial economy in the state courts of Texas. The Courts of Appeals of Texas have been reminded again and again that in virtually all cases if error is found a remand—and a remand only—may be ordered. This is a true concept inasmuch as the Courts of Appeals can unfind certain facts, but these same courts cannot find facts. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646 (Tex.1988); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); *Potter v. Garner,* 407 S.W.2d 537 (Tex.Civ.App.—Tyler 1966, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L.REV. 361 (1960); Garwood, *The Question of Insufficient Evidence on Appeal,* 30 TEXAS L.REV. 803 (1952).

"Therefore, we determine that the issuance of a writ of mandamus is an appropriate remedy in a procedural chronology such as the one before us. See *Mother Frances Hospital v. Coats,* 796 S.W.2d 566 (Tex.App.—Tyler 1990, no writ). We further conclude that good cause was shown by the City.

"A forceful argument was made by one of the attorneys for the Respondent to the effect that the City's expert would be simply giving cumulative evidence. We must disagree. The plaintiffs, the Millers, have a right to put their witnesses on in an order that they deem advantageous to their

cause. Likewise, the parties defendant have the same, equal right. There is no meaningful showing in this record before us that at the trial on the merits the City's witnesses and their testimony would be merely cumulative. The City may elect to put on the witness stand its last two designated witnesses. But it now seems certain that the learned trial judge has affirmatively and unequivocally ruled that certain of the City's experts will not be allowed to mount the stand and testify before the jury.

"Modern rules of evidence favor the introduction of expert testimony to aid the jury in arriving at the highest quality of findings, the highest quality of verdict, and therefore, the highest quality of justice.

"It cannot be gainsaid that the Supreme Court in recent years has been enlightened, liberal, progressive and almost all encompassing in favor of broad, indepth, complete discovery. Query: Why have this vast discovery if the results of this vast, indepth, thorough and complete discovery are not made available to the jury or to the fact-finder? Why not let the jury have the full benefit of all relevant, admissible, nonredundant discovery? But the discovery must be complete and even-handed; it cannot be one-sided. And the discovery must be in accordance with the applicable Supreme Court Rules of Civil Procedure.

"On February 18, 1991, a motion to strike Dr. Baerwald was filed. On February 25, 1991, the motion to strike Dr. Olin Dart was filed. The court gave permission for Dr. Baerwald to testify. But the court struck Dr. Dart.

"This is not a sanction case as advanced by Respondent. Sanctions do not apply because there was no order as to the Relator to do something which the Relator had failed to do.

"Furthermore, when each side knows that all of the evidence (all of the relevant, material, admissible evidence properly obtained under the Rules) will go before the jury, they are put in a better position to evaluate the case and to bring about an amicable, just settlement to all parties involved. Encouraging settlements is one declared, desirable goal of liberal discovery. Indeed, settlements have been declared to be one of the major objects of the liberal discovery rules. Furthermore, the trial of the case really is a proceeding *to determine the truth and the whole truth.* "Upmanship" and "gamesmanship" have been denounced.

"There exists well-reasoned precedents to the effect that witness exclusion rulings cannot eviscerate or emasculate either the defenses of the lawsuit or the theories of recovery in the lawsuit. *See and compare Mother Frances Hospital v. Coats, supra; Williams v. Crier,* 734 S.W.2d 190 (Tex. App.—Dallas 1987, orig. proceeding) wherein it was held in substance that the right to make a complete, "whole truth" record and thereafter take that record up on appeal amounts to an adequate remedy. At this point the defendants cannot properly make or preserve a record for review or appeal concerning Dr. Petty's tests, lack of tests or his testimony.

### *"The Circumstances of Dr. Petty's Deposition*

"Dr. Petty testified by deposition that he did not "digest away" the skin or other parts of the remains of Chad. He actually cut the skin away. This physician testified that Chad's remains were quite stiff because they had been embalmed. The physician also testified that he had cut from the shoulder joint down to the elbow joint of the left humerus. The humerus, he explained, is the arm bone. This arm bone was in three or four segments. The remainder of the left arm remained in the coffin.

"The deposed physician testified that he cut along the right side of the neck of Chad to get to the spine itself so that he could remove the majority part, although not all, of Chad's cervical spine. The record reflects that Dr. Petty was the only pathologist at the exhumation of the body which took place on or about January 16, 1991.

"One of the attorneys for the plaintiffs was also present along with one Craig Melancon who was connected with the funeral

home. The parts of Chad's remains were taken to Dallas by Dr. Petty. Certain tests were performed in Dallas on the cervical spine and the humerus bones to test for pick-up traces of metal. Dr. Petty failed to make a number of available tests (at least three) which he could have performed with a dissecting microscope and certain x-ray tests and one test known as emission spectrography. The necessary, specialized, sophisticated equipment was in Dallas and available to Dr. Petty. These tests could have indicated whether there was metal involved that would cause the breaks in the bony structures and other parts and also what kinds of metal or metals were involved, such as galvanized metal, chrome metal or other types or kinds of metals or steel. The record reflects that Dr. Petty then turned over these parts of Chad's body to a Dr. King and these various parts were put in an enzyme or enzymes, apparently by Dr. King also.

"These enzymes have a tendency and are capable of destroying or taking away tissue and they also affected and changed probably the bony structures, themselves. There is certainly some evidence in the record before us that the various pieces and articles of evidence dealt with by these two Dallas physicians have been changed or altered, if not, indeed, partially destroyed. Dr. King resides in Dallas or practices there.

"It is clear that there are two different, contended-for basic versions or actually two different scenarios in this case. One contended-for theory by some of the parties is that the car rolled on to the boy and either injured or crushed his head in some manner or the car door opened and then slammed on him and, in some manner severed his head. The other scenario is that the guy wire which was hooked on to a telephone pole severed Chad's head. Both of these scenarios do involve metal; but the metals are of seemingly different types. Hence, it seems clear that the presence of metal or the non-presence of metal and what type of metal was present, if any, becomes of grave importance to the rights of all the parties and to the merits of this tragic case.

"Our Texas Supreme Court has addressed a procedural chronology similar and akin to the issues here in *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984). The Supreme Court has demonstrated and determined that an appeal, after trial, is not an adequate remedy. In deciding these issues, the Supreme Court held as follows, at pages 576 and 573, respectively:

Moreover, requiring a party to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal, falls well short of a remedy by appeal that is "equally convenient, beneficial, and effective as mandamus." *Crane v. Tunks*, 160 Tex. 182, 328 S.W.2d 434, 439 (1959); *Way & Way v. Coca Cola Bottling Co.*, 119 Tex. 419, 29 S.W.2d 1067, 1071 (1930); *Cleveland v. Ward*, 116 Tex. 1, 285 S.W. 1063, 1068 (1926).

\* \* \* \* \* \*

In making this determination, we note that the ultimate purpose of discovery is to seek the truth, so that disputes may be decided by what the facts reveal, not by what facts are concealed. *See West v. Solito*, 563 S.W.2d 240 (Tex.1978); *Pearson Corp. v. Wichita Falls Boys Club Alumni Ass'n*, 633 S.W.2d 684 (Tex.App.—Fort Worth 1982, no writ). For this reason, discovery is not limited to information that will be admissible at trial. To increase the likelihood that all relevant evidence will be disclosed and brought before the trier of fact, the law circumscribes a significantly larger class of discoverable evidence to include anything reasonably calculated to lead to the discovery of material evidence. *Allen v. Humphreys*, 559 S.W.2d 798, 803 (Tex. 1977); Tex.R.Civ.P. 166b(2).

"Justice Kilgarlin, of the Supreme Court, wrote the opinion in *Garcia v. Peeples*, 734 S.W.2d 343 (Tex.1987). The opinion of the Court endorses the following at page 347:

Shared discovery is an effective means to insure full and fair disclosure. Parties subject to a number of suits concerning the same subject matter are forced to be consistent in their responses by the

knowledge that their opponents can compare those responses. *See Buehler v. Whalen* [70 Ill.2d 51, 15 Ill.Dec. 852, 859], 374 N.E.2d [460] at 467 [ (1977) ]; S. Baldwin, F. Hare, F. McGowan, *The Preparation of a Product Liability Case* § 5.2.5 (1981).

*In addition to making discovery more truthful, shared discovery makes the system itself more efficient.* (Emphasis added)

\* \* \* \* \* \*

A number of courts have recognized that allowing shared discovery is far more efficient than the repetitive system now employed. Federal courts, for instance, have overwhelmingly embraced this practice in order to streamline discovery.

"See especially Tex.R.Civ.P., Rule 166b; 167(1)(g); 167a(a), (b)(2). We declare our support for shared discovery.

"The record reflects that (at least from some of the trial counselors) three different options were suggested to the trial court. One was to exclude the plaintiffs' evidence by Dr. Petty concerning the parts of the body and of course, the other, or second option, was to allow Dr. Petty's testimony in. That is, the trial court should allow in evidence all of Dr. Petty's testimony or totally exclude Dr. Petty's testimony. There was a third option discussed before the trial judge. It was said to be a reasonable or middle option.

"That option was to have the court to order the reexhumation of the corpse and allow the defendants' experts to look at it and see if they can make meaningful, comparable, equal, equitable tests at this point in time. Future events can have a crucial and definitive effect on virtually all of these contested matters.

"It is submitted that the case of *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984), stands clearly for the proposition that discovery is meant to arrive at the ultimate, complete, whole truth. The trial court denied a motion to preclude the plaintiffs' use of any evidence obtained or based on the exhumation of Chad Miller's remains. Under the record as presently before us, we think that that leads to an unfair, inequitable result and to an abuse of the judge's sound judicial discretion.

"*If the case goes forward to trial under the present status of the case,* we think the City of Port Arthur and Southwestern Bell will not have a truly adequate remedy at law nor will they have an adequate remedy of appeal. The losing party or parties, in any event, can, of course, perfect an appeal, but under the record as it now stands, these parties cannot fully present their theories of the case. Therefore, they cannot show to the appellate court the errors they rely upon for a reversal of the judgment.

"No notice or any type of request was served on Southwestern Bell or the City of Port Arthur of the exhumation and testing. No notice having been given, there was no hearing held by the trial court and no order was entered in accordance with the rules that provide for notice of the exhumation and notice of the somewhat selective testing of certain parts of Chad's body. We do not agree that subsection g of Rule 167(1) is meant to protect only those items a party has produced pursuant to a request. We submit under the present record of Dr. Petty's deposition that some destruction of articles of evidence and material alteration have been shown.

"We think that this dispute involves a discovery issue, if discovery is to have meaning and completeness and is to be a real search for the ultimate truth. Only one side of the case has made discovery in crucial, paramount issues in the case concerning parts of Chad's body; the other sides have not. Several rules of civil procedure have not been adhered to. See Tex.R. Civ.P. 166b, 167(1)(g). The trial court has definitely indicated its rulings involving Drs. Baerwald, Petty, Dart and Faust. The posture of the trial has been determined below. Considering all the facts surrounding a lengthy trial and the applicable rules, Southwestern Bell and the City of Port Arthur do not have a complete, adequate, efficacious remedy by way of appeal.

"Some of the filemarks that were placed on some of the pleadings or motions filed

below are illegible or almost so. These filemarks were printed by a time clock machine or a time stamp machine. This time clock machine records the date, the hour and the minute of the filing of the particular paper, containing also a facsimile signature of the District Clerk. Because we simply cannot read some of these filemarks, it is difficult to know which motion to exclude testimony of certain defense expert witnesses was granted. The Respondent signed two orders striking the City's expert witnesses, each of which was dated March 1, 1991. We think the order excluding Drs. Dart and Faust is the effective one. No criticism of anyone is intended.

### "In Reality, Does The City of Port Arthur Have an Adequate Remedy at Law by Way of an Adequate Appeal?

"Customarily, Texas appellate courts in the past have divided challenges to jury findings mainly into two or perhaps three groups. First is the "no evidence" point or "legal insufficient evidence" point. The second is the "insufficiency evidence" point. And the third is that the jury's verdict is so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust. Recently there has been an excellent and scholarly article in the Texas Law Review of February, 1991, Volume 69, Number 3, page 515.

"This article was written by the Honorable William Powers, Jr., and Honorable Jack Ratliff. Professor Powers holds the Hines H. Baker and Thelma Kelley Baker Chair in Law at the University of Texas Law School. Professor Jack Ratliff holds the Robert W. Calvert Professorship of Law at the University of Texas Law School in Austin. These outstanding authorities in an excellently written article of the highest scholarship, in our opinion, have divided the points of errors that attack or challenge jury findings into five fields or zones. The title of the article in the Texas Law Review is entitled *Another Look at "No Evidence" and "Insufficient Evidence"*.

"*Zone 1* deals with a situation where there is no evidence or no more than a mere "scintilla" of evidence that attempts to support a fact issue. Since there is no evidence, the litigant with the burden of proof on a particular issue is not entitled to have that issue or question submitted to the jury. Such an attempted finding with no evidence to support it will be set aside upon proper appeal and in many cases, the appellate court can render judgment in favor of the opponent. Now, on this no evidence situation does the City have an adequate remedy by appeal? The answer is no. Upon a careful, analytical reading of the testimony of Dr. Petty, a pathologist, there does exist some evidence—certainly more than a scintilla—if found by the jury, to support a jury finding that in this tragic case Chad's head was decapitated by the guy wire. And his left humerus was severely damaged by the guy wire. This conclusion is drawn, of course, as the record now stands before us, realizing that the exhumation and the examination of Chad's major parts of his cervical spine and humerus of his arm were done without notice to the other parties. The applicable rules of discovery cited herein were not followed.

"Concerning *Zone 2*, if there is some evidence of probative force—certainly more than a scintilla on an issue or question—then that issue or question must be submitted to the jury and if the jury finds in favor of the proponent of that issue then (if there is any evidence of probative force or valuation to support the issue) an intermediate appellate court cannot or should not overturn the same. Here again, a careful reading of Dr. Petty's deposition, as the record now stands before us, raises some evidence of probative force and valuation backing up and supporting the plaintiffs' theory of the case concerning the decapitation of the head and the very severe injuries and damages to the humerus. Hence, under Zone 2, the City has no adequate remedy at law by appeal. Nor is this situation or record before us one where there is some evidence to support the issue submitted, but there is not enough evidence of probative force to support a jury's finding in favor of the proponent of the issue. Under this standard of review, the City is

dead in the water. This conclusion is valid because of the well-established and long-recognized rules that a jury may believe all of a witness' testimony or none of a witness' testimony or a jury may believe part of a witness' testimony and disbelieve other parts of the same witness' testimony. Indeed, decisional precedents clearly establish that the jury is the ultimate fact-finder and the ultimate weigher of the preponderance of the evidence when it comes to expert testimony.

"In *Zone 3,* (following the classifications made by Professor Powers and Professor Ratliff) there is enough, ample evidence to support a jury's verdict as advocated by the proponent and, hence, a reviewing court would not be permitted or justified in overturning such a finding. The intermediate appellate court is not a super jury. Under the constitutional law of Texas we cannot and should not disturb these findings of fact made by the jury. Under Zone 3 the City, again, has no practical—certainly no adequate—remedy at law by appeal.

"In *Zone 4,* the record and the evidence favoring the proponent's position on the issues submitted to the jury are even stronger and there exists ample evidence to support the jury's finding. The issue must go to the jury and a reviewing court cannot and must not set the jury's findings aside. There is one very rare case or situation and that is when the reviewing court would be authorized to set aside a jury finding because the finding is. against the great weight and preponderance of the evidence. Again, under this present record, we think, that the City is the loser on appeal, having no adequate or meaningful remedy at law by way of appeal.

"*Zone 5* is not especially relevant here. In Zone 5, the proponent of the issue has introduced evidence that is so cogent, strong, and ultimately compelling to prove a fact conclusively. That is, the proponent has proved a fact "as a matter of law". In this Zone 5 situation, which is relatively rare, a reviewing court can set aside a contrary finding and render judgment for the proponent. Briefly stated, as in and with Zone 1, when the state of the evidence and the record falls into Zone 5, there is really no issue of fact for the jury to decide. The issue becomes a matter of law. However, under this record as it now stands in view of the disputed deposition testimony before us, the City cannot prevail under Zone 5. Thus, the City has no realistic, practical, pragmatic, adequate remedy at law by way of an appeal. For this reason the writ of mandamus should be granted.

"It must be stressed and emphasized that the other parties to the lawsuit (other than the Millers) have had no notice and have had no chance to perform similar and equal tests on the crucial parts of the corpse of the young boy.

"The City of Port Arthur has a vital interest in the liability issues, in all of the damage issues and in the facts concerning how the tragic death of young Chad occurred. The City also has a vital interest in whether a decapitation took place and how the same occurred. Additionally, the City has a vital interest in how the injuries and damages to young Chad's humerus and cervical spine occurred. Port Arthur, as well as Southwestern Bell, among other issues, has a vital interest in the issues concerning comparative negligence, the damages for wrongful death of a minor child as claimed by the surviving parents, and the damage issues as well as the apportionment concerning the damage issues.

"The parties other than the real parties in interest have taken the position that the car rolled over, in some manner, upon poor Chad causing the injuries to his humerus, neck and cervical spine. That is, the car was the offending instrument. However, it seems clear that the Millers take the position that the decapitation and injuries were caused by the guy wire. In view of the position of the parties, our comments and rulings concerning Dr. Petty's deposition are relevant.

"Furthermore, we conclude that the Relator, the City of Port Arthur, timely and properly responded to the Respondent's discovery and designations considering all the factors and surrounding circumstances in designating Dr. Olin Dart and Dr. David

Faust. We think it goes without saying that the City had no actual, affirmative and unilateral duty or obligation to produce a report from an expert when the simple fact was that no such report existed and the trial court had not ordered such a report to be prepared. Since the relevant rules of civil procedure as set out herein were not followed or adhered to (indeed, they were violated) we issue the writ of mandamus.

"If, however, the remaining parties to the lawsuit in the future can have equal or nearly equal testing of the vital and crucial parts of Chad's body, maybe then, in that case, Dr. Petty's deposition might become admissible. This paragraph is an observation; it is not a contingent order.

"The trial court has an affirmative duty to enforce the Rules of Civil Procedure adopted by the Texas Supreme Court. So do we. These Rules are "orders of court" to the trial judge and to the Court of Appeals. These Rules generally are mandatory on the lower courts; otherwise, uniformity of practice and discovery procedures cannot be attained throughout Texas. Thus, for this additional reason, the writ of mandamus will lie. Drs. Baerwald, Dart and Faust should be allowed to testify.

"Hence, we sanguinely conclude that the issuance of this writ of mandamus will enable the jury to hear and weigh all of the relevant, material facts except Dr. Petty's evidence (as the record now stands). Thus, the jury can and very probably will arrive at the highest quality of verdict resulting in the highest quality of justice between and among the various parties-litigant. The writer urges that this opinion be read in conjunction with the writer's dissent in *Southwestern Bell Telephone Company v. The Honorable Gary Sanderson*, 810 S.W.2d 485 (Tex.App.—Beaumont, 1991). Since the proper discovery rules were not enforced, when a duty existed to do so, the:

"WRIT OF MANDAMUS IS ISSUED in accordance with this opinion."

But it should be clearly understood that the above opinion turned out to be and is a dissenting opinion.